**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DT AMERICA CORPORATION** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION No.: _____** |
| | § | |
| **JULIEN LESECH, INGRID BARRON,** | § | |
| **SEAN DULLE, APROJECTS USA, LLC,** | § | |
| **and PROJECT SERVICES USA, LLC** | § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**
**FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff DT America Corporation ("DT America") files this Original Complaint for Injunctive Relief and Damages against Defendants Aprojects USA, LLC ("Aprojects"), Project Services USA, LLC ("Project Services"), Julien Lesech ("Lesech"), Sean Dulle ("Dulle"), and Ingrid Barron ("Barron") (Barron, Dulle, and Lesech together, the "Former Employees")[1] and in support thereof would show this Court as follows:

## NATURE OF THE CASE

1.       This is a case about betrayal, deception, and calculated attempts to destroy DT America by the very employees entrusted to run and grow the company's U.S. operations. Instead of acting as the loyal stewards of the company's business that the law requires, those individuals covertly conspired with a direct competitor to dismantle DT America from within, misappropriate its trade secrets, sabotage client relationships, and steal its personnel and assets.

2.       This scheme was a coordinated effort between Aprojects, Project Services, and the Former Employees — each of whom knowingly and unlawfully engaged in, and are currently

---

[1] The Former Employees, Aprojects, and Project Services are referred to collectively herein as the "Defendants."

perpetrating, a widespread conspiracy that has caused, and continues to cause, substantial economic and reputational harm to DT America. Defendants acted with full knowledge of the Former Employee's legal obligations to DT America, while systematically trying to cover their tracks by destroying and hiding evidence of their malfeasance.

3.     This lawsuit is not only an effort to hold all of the Defendants accountable for their illegal acts, but also to uncover the true breadth of their premeditated campaign and to prevent the imminent and irreparable harm that DT America will undoubtedly suffer if the Defendants' ongoing efforts to dismantle the company are not restrained.

## **PARTIES**

4.     Plaintiff DT America Corporation is a foreign for-profit corporation organized under the laws of the State of Georgia with a principal office in Houston, Texas.

5.     Defendant Julien Lesech is an individual residing in Atlanta, Georgia. He may be served at 1200 Wing St. Unit 16, Sandy Springs, Georgia 30350, or wherever he may be found.

6.     Defendant Ingrid Barron is an individual residing in Texas. She may be served at 7627 Cypress Dr., Humble, Texas 77396, or wherever she may be found.

7.     Defendant Sean Dulle is an individual residing in Charleston, South Carolina. He may be served at 174 Dunnemann Ave., Charleston, South Carolina 29403, or wherever he may be found.

8.     Defendant Aprojects USA, LLC is a foreign limited liability company organized under the laws of the State of Delaware with a principal office in Albany, New York. Plaintiff is informed and believes that Aprojects is engaged in regular, ongoing business in the State of Texas and may be served through its registered agent: David R. Brewer, 900 Rockmead Dr., Suite 132, Kingwood, Texas 77339.

2

9.    Defendant Project Services USA, LLC is a foreign limited liability company organized under the laws of the State of Georgia with a principal office in Atlanta, Georgia. Plaintiff is informed and believes that Project Services is engaged in regular, ongoing business in the State of Texas and may be served through its registered agent: Cogency Global Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 75201.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 and 1367, because this action concerns the theft of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. sections 1836, et seq. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. section 1367.

11.    Venue is proper in this District under 28 U.S.C. section 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District. As detailed herein, Defendants targeted and undermined DT America's operations in Houston, Texas, including orchestrating the solicitation and mass resignation of employees from its Houston office and, upon information and belief, misappropriating proprietary data maintained and accessed from that location. Additionally, Defendants interfered with existing and prospective contracts, business relationships, and opportunities for prospective economic advantage managed from DT America's Houston facility and caused DT America significant business harm within this District.

## FACTUAL BACKGROUND AND ALLEGATIONS

**I.    DIMOTRANS Group Developed DT America to Offer Complex Logistics Solutions in the United States for Well-Known Multinational Corporations.**

12.    DT America is a wholly owned subsidiary of DT Project, which is part of the global DIMOTRANS Group ("Dimotrans"). Dimotrans is a multinational logistics and freight forwarding conglomerate headquartered in France that has operated for more than 40 years with 70 branches,

16 subsidiaries, and over 2700 employees.

13.    DT America was established in 2013 to act as the U.S.-based logistics and industrial project arm of Dimotrans. DT America serves multinational customers in sectors ranging from energy and construction to manufacturing and agriculture. Its services span national and international ocean and air freight, trucking, warehousing, customs brokerage, project cargo logistics, and transportation management. DT America employs sophisticated proprietary systems to manage its operations, project bids, subcontractor networks, and client communications, ensuring security, efficiency, and compliance with regulatory standards.

14.    With significant nationwide infrastructure, including key facilities in Houston, Texas; Atlanta, Georgia; and Charleston, South Carolina, DT America plays a critical role in coordinating national and international shipments and freight movements for its clients. DT America's client portfolio includes well-known enterprises such as ████████████████ ████████████████    who rely on DT America to deliver timely and technically demanding transport solutions.

15.    As a trusted logistics partner, DT America is deeply embedded in the supply chains of its customers, often managing cradle-to-destination services that require careful orchestration of multiple carriers, warehousing, licensing, and secure data handling. The company's competitive advantage rests on its intellectual capital—confidential pricing and bidding strategies, proprietary software systems, and deep knowledge of its customer preferences and requirements for the various types of projects DT America handles.

**II.    DT America Grew into a Successful Operation and Installed Lesech, Dulle, and Barron as the Primary Managers of the Company's Operations.**

16.    DT America was founded with an ambitious vision to further expand the Dimotrans' international operations into the United States by leveraging its long-standing and

hard-earned reputation for premier customer service. The implementation of that vision was entrusted to Defendant Lesech, a French national and long-time Dimotrans employee who had risen through the ranks over several years.

17.     Lesech began his career with the company acting as a Finance Manager for Dimotrans' China operations, and he later relocated to Canada where he gained experience in the group's international operations as a Key Account Manager. In this role, Lesech was responsible for establishing Dimotrans' North American network including developing trade and shipping lanes between North America and Dimotrans' preexisting operations in Asia and Europe, as well as fostering relationships with executives and managers of potential customers. These efforts turned into the foundation for, and led to the creation of, DT America. Indeed, many of DT America's initial customers came from the relationships Dimotrans built while Lesech was working for Dimotrans in Canada.

18.     Given his cross-border logistics expertise, as well as the leadership potential the company perceived at the time, Dimotrans executives selected Lesech to spearhead the launch of DT America. Dimotrans relocated Lesech to Atlanta, Georgia, and later supported his application for permanent residency in the U.S., describing him in U.S. Citizenship and Immigration Services filings as the principal architect and global leader of DT America's operations.

19.     In 2015, Lesech was elected as a director of DT America and was allowed to participate in the equity ownership of the company, which he did through his own entity, AS Alliance, LLC. In 2017, DT America promoted Lesech to Vice President, an executive-level officer position in which Lesech held significant authority over the formation and operational expansion of the company. Over time, his role evolved to include supervisory control of regional managers and oversight of client development, vendor relations, and internal compliance.

20.     Lesech recruited and hired key personnel for DT America, negotiated contracts, developed strategic client relationships, and oversaw major accounts such as ███████████ ██████. He exercised approval authority for operational expenditures and vendor arrangements.

21.     Importantly, Lesech assisted in the implementation of the critical software platforms that store DT America's confidential data such as client pricing, subcontractor lists, shipment routing, historical quotes, and margin analysis. Lesech's influence extended across DT America's growing national footprint as he developed and supervised operations throughout the United States.

22.     By 2018, DT America's business was thriving and the company tasked Lesech with growing its American workforce, including in Charleston, South Carolina, where he hired an experienced logistics manager named Sean Dulle ("Dulle"). Lesech offered Dulle the position of Business Development Manager, a role that would allow Dulle to be deeply involved in DT America's sales and account management while contributing to the company's domestic and international vendor networks. Through that role, Dulle gained an intimate understanding of DT America's operations, client base, bidding process, prospective clients, and financial records.

23.     Recognizing the value of this type of company information and the need to protect it from third-party disclosure, and consistent with DT America's confidentiality policies for all personnel, Lesech conditioned Dulle's employment offer on Dulle's acceptance of certain restrictive covenants. Specifically, Lesech required Dulle to sign agreements obligating him to maintain the secrecy of DT America's trade secrets and confidential information.  The agreement also prevented Dulle from recruiting or soliciting any of DT America's employees and or prospective customers, both during Dulle's employment and for a reasonable duration thereafter.

24.     On January 1, 2018, Dulle executed the employment and restrictive covenant

agreement and assumed his new position with DT America. Over the next several years, Dulle and Lesech worked closely as they grew DT America's client base and expanded its national reach, with Dulle ultimately rising into the role of Branch Manager of the Charleston office in June 2022. In his role as Branch Manager, Dulle had full access to DT America's sensitive commercial materials, including but not limited to client data, pricing strategies, subcontractor lists, and historical bid templates.

25.    Following the establishment and expansion of the Atlanta and Charleston offices, DT America next turned its sights on the critical hub of Houston, Texas. Knowing the importance that the Houston facility would ultimately hold in DT America's overall strategic goals, Lesech sought to hire a seasoned professional with experience managing complex freight operations to lead the office. He found just such a person in Defendant Ingrid Barron. With the assistance of Dulle, who was intimately involved in the recruiting and hiring process, Lesech and Barron agreed that Barron would oversee the operations of DT America's Houston office, and she was formally offered the position of Branch Manager in late 2023.

26.    As Houston's Branch Manager, Barron oversaw DT America's air and ocean freight contracts, maintained TSA air freight compliance, supervised and managed Houston-based employees and contractors, and safeguarded key customer accounts. To fulfill her job duties, as with Dulle, DT America gave Barron full access to its sensitive commercial materials, including but not limited to client data, pricing strategies, subcontractor lists, and historical bid templates and supporting information.

27.    Consistent with the company's policies emplaced to protect its confidential and trade secret information, customer base and employee relations, and as DT America had previously done with Dulle and others, DT America conditioned Barron's employment at DT America on her

agreement to the terms of a Restrictive Covenants Agreement (the "Barron Restrictive Covenant Agreement" or "BRCA"). On December 14, 2023, Lesech, on behalf of DT America, and Barron executed the BRCA, wherein Barron agreed to a variety of confidentiality, non-disclosure, and non-solicitation provisions. Dulle's significant involvement in Barron's hiring and his knowledge of DT America's corporate policies meant he was also well aware of the terms of Barron's employment.

28.    These terms included Barron explicitly agreeing not to disclose, copy, or remove DT America's Trade Secrets or Confidential Information:

> **Non-Disclosure of Trade Secrets or Confidential Information.** During employment, and for a period of one (1) year thereafter, Employee shall not divulge, use, furnish, disclose or make accessible to anyone other than the Company, any Confidential Information or Trade Secrets belonging to the Company. This restriction applies for as long as the information remains Confidential Information or a Trade Secret….

29.    Barron further agreed that she would not solicit any of DT America's customers or employees during her employment and for one year after her employment ended:

> **Non-Solicitation of Customers.** During employment, and for a period of one (1) year thereafter, Employee shall not, directly or indirectly, for him/herself or another: (i) take any action to contact or solicit any Customer of the Company for the purpose of selling or offering any product or service similar to or competitive with any product or service sold, offered or under development by the Company during the twenty-four (24) month period immediately preceding the Separation Date; (ii) take any action to solicit, entice, induce, or encourage any Customer of the Company to discontinue using or to reduce its use of the Company's products and/or services; or (iii) take any action to solicit, entice, induce or encourage any Customer of the Company to discontinue referring prospective customers to the Company.

> **Non-Recruit.** During employment, and for a period of one (1) year thereafter, Employee shall not, directly or indirectly, for him/herself or another, recruit or solicit to hire, any employee of the Company who is, at the time or recruitment or solicitation, actively employed by the Company in an executive, managerial, sales or skilled capacity.

30.    With these protections in place, Barron officially assumed her role as Houston Branch Manager and worked with Lesech and Dulle to grow the office into an anchor of DT America's business, directly responsible for more than $███████ of the company's yearly revenue. During her time running the Houston office, Barron enabled the company to obtain the necessary certifications that allowed DT America to bring its air freight operations largely in-house leading to a competitive advantage over many of its competitors. While managing DT America's nationwide airfreight and maritime operations Barron serviced established customers that served as the cornerstone of DT America's activities in North America, such as ███████████, and she was empowered to bring on new DT America customers, vendors, and agents such as ███████ ████████████████████████████████████████████ ███████████, and many others.

31.    Around the same time that Barron was hired in 2023, Dimotrans underwent a restructuring pursuant to which the company's managers who were owners of its subsidiaries, such as Lesech with respect to DT America, exchanged their equity interests in such subsidiaries along with other consideration, such as cash, for equity ownership in holding companies whose sole purpose was to own equity shares of Dimotrans (the "Restructuring"). The Restructuring was effectuated in accordance with a Protocol of Contribution and Transfer of Shares of Freight Invest, dated June 15, 2023, by and among Dimotrans, AS Alliance LLC, AS France Invest, and Freight Invest, among others (the "Restructuring Protocol" or the "Protocol"). Pursuant to the Protocol, DT America shares held by AS Alliance LLC were transferred to Dimotrans' subsidiary, and DT America's parent, DT Project and cash from AS France Invest was transferred to Dimotrans in exchange for shares of Freight Invest, a holding company formed to own Dimotrans shares. Lesech signed the Protocol on behalf of each of AS Alliance LLC and AS France Invest.

32.    Consistent with Dimotrans' more general policies and practices that were also implemented and existed at DT America the Protocol required the parties to maintain strict confidentiality of certain materials:

> **Confidentiality.** Each Party agrees to keep strictly confidential all information, documents, and discussions related to: … Financial, legal, or strategic data of the other parties and of the Dimotrans Group. … This obligation of confidentiality shall survive the termination or expiration of this Protocol for a period of five (5) years from the signature date.

33.    In connection with the Protocol, Freight Invest and the shareholders of Freight Invest, including without limitation AS France Invest and Infinity ("Freight Invest Shareholders"), entered into a shareholders agreement dated as of June 27, 2023 (the "Freight Invest Shareholders Agreement"). Lesech signed the Freight Invest Shareholders Agreement on behalf of AS France Invest.

34.    The Freight Invest Shareholders Agreement contains other provisions that are consistent with Dimotrans' and DT America's general policies and practices of protecting its business partners and employees from inappropriate solicitation, including the following provisions:

> **Business exclusivity.** Each [Freight Invest Shareholder], for as long as he or she holds shares in [Freight Invest's] capital and, cumulatively, carries out an activity within the [Dimotrans Group and all of its direct and indirect subsidiaries (the "Group")], undertakes … to :
> − devote his entire professional activity to [Freight Invest] and the time required to develop the Group;
> − not to engage in any activity or hold any corporate office in any company other than a Group company (notably as a Shareholder, shareholder, investor, executive, corporate officer or as an employee, agent or consultant), with the exception of any corporate office in any proprietary holdings they may have, and provided that such office has no significant effect on the time devoted to the Group.
>
> **Non-Solicitation.** Each [Freight Invest Shareholder] is prohibited from soliciting or engaging, in any form whatsoever and by any means whatsoever, including directly or indirectly through an intermediary, for

10

a period of 12 months following the date of Transfer of all of his or her [Freight Invest] Securities, on his or her own behalf or on behalf of a Third Party - as a self-employed person, employee, director, agent, consultant, Shareholder, etc. - any person who is a corporate officer or has an employment contract with a Group company, during the year preceding the date on which his or her duties cease (Shareholder/employee) – or any person having the status of corporate officer or bound by an employment contract to a Group company, during the year preceding the date of cessation of his functions (Shareholder/employee).

**Non-competition.** Each [Freight Invest Shareholder] undertakes, from the date of signature of this [Freight Invest Shareholder Agreement], for the duration of its shareholding in the Company and for a period of 12 months following the date of Transfer of all of its [Freight Invest] Securities, throughout mainland France:
(i) not to hold, directly or indirectly, any shares in companies whose business competes with that of the Group;
(ii) not to take an interest in, create or develop, directly or indirectly, alone or jointly, any company whose business competes with that of the Group;
(iii)not to hold, directly or indirectly, any position whatsoever (manager, representative, employee, consultant, subcontractor, etc.) in a company whose business competes with that of the Group.

35.     With Lesech at the helm — seemingly further entrenching his commitment and undivided loyalty to DT America as part of the restructuring — and with key managers such as Dulle and Barron in place to coordinate subordinates and operations on the ground, DT America was poised to achieve the goal of national and international freight integration that Dimotrans envisioned when it invested in the creation and development of DT America.

### III.    Defendants Conspire to Destroy DT America's Operations and Move Business and Employees for the benefit of Aprojects.

36.     DT America, its parent DT Project, and the broader Dimotrans group believed that the Former Employees were continuing to develop and grow DT America. What they did not know at the time was that the Former Employees were surreptitiously planning a coordinated exit from the company and a move to a direct competitor, namely Defendants Aprojects and/or Project Services.

37.    Plaintiff's initial investigation has revealed that as early as January 9, 2024, less than a month after Lesech hired Barron to run DT America's Houston office, Lesech was scheduling calls with executives at DT America's competitors, including with Aprojects' Chief Executive Officer Yoeri Torfs. DT America had no legitimate business with Aprojects that would have warranted extended phone calls between DT America's Vice President and a competitor's CEO. Nevertheless, their early coordination continued as Lesech held at least two additional extended calls with Mr. Torfs on February 5, 2024 and August 13, 2024, during which they spent more than two hours discussing, upon information and belief, the Former Employee's transition from DT America for the benefit of Aprojects.

38.    A retrospective review of corporate financials has also uncovered that on multiple occasions during the 2024 fiscal year, Lesech and Dulle leveraged the business trips they were taking to France on behalf of, and funded by, DT America to secretly attend in-person meetings with Aprojects' leadership.

39.    DT America only recently learned that various Aprojects representatives and their counsel visited DT America's Atlanta office on multiple occasions at the end of 2024 to meet with Lesech, despite there being no legitimate DT America business with Aprojects that would justify repeated office visits with legal counsel present. DT America did not know about such meetings or authorize Aprojects representatives and counsel to meet with Lesech or any other DT America representative.

40.    Given the information that Plaintiff has since uncovered, it appears that the meetings were related to the formation of Defendant Project Services USA LLC, a company that the Former Employees and Aprojects would eventually use as a tool to conduct their malfeasance. Indeed, that entity was formed by Mr. Torfs and, upon information and belief, Lesech on January

14, 2025, just two weeks before Dulle departed DT America and not long before Lesech's and Barron's departure. Logs that track the files that Lesech deleted from his DT America-issued computer show that Lesech was reviewing a Memorandum of Understanding for Project Services at the end of 2024 and paperwork for Project Services' creation just a day before Mr. Torfs formally registered the company.

41.    Upon information and belief, Project Services was created to facilitate the covert transition of the Former Employees, and the DT America employees they were able to influence, to Aprojects.

42.    Shortly after the formation of Project Services in early 2025, Lesech informed Dimotrans for the first time that he was considering leaving DT America and was evaluating other employment prospects. In an attempt to mitigate the potential fallout from the possible departure of the chief architect of DT America's development and operations, the CEO of Dimotrans and its Human Resources Director traveled to the United States to meet with Lesech throughout the week of February 3, 2025. During these meetings, Lesech outlined his vague and largely undefined plans to engage in an identical business that would compete with DT America and its subsidiaries in the same territories where DT America operated. While initially taken aback, Dimotrans sought to avoid a lengthy and contentious separation battle with Lesech and instead presented him with various proposals that sought to protect DT America's business while allowing Lesech to continue working in the freight industry.

43.    Lesech rejected each of the options that were presented to him. He followed up by emailing Dimotrans representatives with his own proposed written terms of departure on or about February 12, 2025.

44.    Both options Lesech conveyed  to Dimotrans representatives demanded that

Dimotrans agree to waive all restrictive covenants Lesech had previously agreed to and other applicable DT America general corporate practices and requirements that upon separation, employees do not interfere with DT America's business, solicit customers, or attempt to recruit DT America employees.

45.    Not surprisingly, DT America rejected Lesech's proposal. However, a counter-offer was conveyed to Lesech that would have allowed him to operate in the industry while protecting DT America's corporate interests. Lesech did not accept DT America's counteroffer.

46.    Lesech officially separated from the company on March 13, 2025, with Barron following shortly thereafter on April 30, 2025. Lesech and Barron also leveraged Dulle, whose last day at DT America was on January 31, 2025, to help coordinate with Aprojects and perpetrate their scheme to, as they apparently put it to one DT America customer, transfer "all of DT America's personnel and operations to a competitor."

> **a.  Prior to and after their departure, Defendants Diverted DT America's Business for the benefit of Aprojects.**

47.     Much of the information DT America has learned about Lesech, Dulle, and Barron's attempts to divert, and their actual diversion of, DT America's business for the benefit of the Defendants arose as a result of DT America's customers inadvertently directing correspondence, order confirmations, and scheduling items to the Former Employees' DT America email addresses following their resignations from the company. Many of these emails specifically identify Aprojects as the competitor to whom business from DT America customers was diverted. The customers whose business was diverted to Aprojects, either directly or through Project Services, were long-standing DT America customers for whom DT America routinely performed, and whose business comprised a significant portion of DT America's revenue such as █████

█████

48.    Shockingly, DT America's investigation has uncovered evidence that Lesech, Barron, and Dulle began diverting business to Aprojects well before they left DT America. For example, on February 3, 2025, only three days after Dulle departed DT America for Aprojects, an email from a ████ representative directed to Dulle's DT America email address expressed that ████ was looking "forward to initiating discussions between ████ *and A-Projects*" and discussed the execution of a Non-Disclosure Agreement before the discussions could continue. Barely a week later, without any context or explanation, Barron forwarded Aprojects a presentation that had been put together for DT America by ████, one of the vendors the company utilized to provide services to ████. Upon information and belief, Barron did so to assist Dulle in facilitating the transition of certain ████ projects from DT America for the benefit of Aprojects and the Former Employees, personally.

49.    On March 12, 2025, DT Project's Chief Executive Officer, Bruno Kenner, received an email from a ████ representative stating that Lesech had informed ████ that "today is [Lesech's] last day with DT" and that Lesech had advised that "the DT team does not have a transition plan once he departs." The representative also advised that Lesech "expects that a portion of the current team will leave in 2 to 3 weeks, while the remainder will leave in 6 weeks time."

50.    Mr. Kenner initially dismissed what he believed to be Lesech's misstatements because, at the time, DT America's parent companies had no reason to expect that Lesech himself would orchestrate the mass departure of critical employees that would ensure Lesech's statements ultimately came true. It was only upon the subsequent investigation that led to this litigation that the company learned the ominous nature of the March 12 email.

51.    Less than a week later, on March 17, 2025, DT America received another email from ████ addressed to Dulle, who had already officially been working for Aprojects for more

than a month, explaining that ███████ had urgent storage needs but had been informed that DT America's warehouse was full. This was not true; DT America's warehouse was not full at that time. From these sorts of email, it is clear that Lesech and/or Dulle, both before and after leaving DT America, supplied DT America customers with false information to divert DT America's business to Aprojects and, upon information and belief, have continued to do so.

52.    On March 25, 2025, DT America's request to carry out an oversized delivery transport for ███████ was rejected and awarded to a competitor despite DT America having competitive rates, the capacity and ability to effectuate the delivery, and a history of performing similar services for ███████ This type of situation has repeated itself in the months following and, upon information and belief, because of the actions of the Former Employees, DT America has been consistently losing ███████ bids to Aprojects and other competitors for work that DT America routinely handled for those customers in the past.

53.    As recently as July 23, 2025, DT America was notified that it had been de-referenced from a ███████ project as a result of the perceived instability of DT America's brokerage services stemming from the volatility caused by the Former Employees' conduct. Upon information and belief, the loss of ███████ business is also attributable to Defendants' use of DT America's confidential and trade secret pricing and bidding information to consistently undercut DT America's bids as well as Defendants' misrepresentations to ███████ and other potential customers about DT America's capabilities and capacity.

54.    ███████ is not the only customer Defendants were redirecting business from for the benefit of Aprojects. In a strikingly brazen example, on February 26, 2025, DT America customer ███████ requested urgent arrangements for DT America to ship and store a variety of materials at DT America's Summerville warehousing location. On March 3, 2025, just

ten days before Lesech's separation on March 13, ████████████ unexpectedly notified DT America that it had decided to "go with another company…to save on costs." This sudden revocation of the order was driven by Dulle and Lesech who directed Charlie Luther, a then-DT America employee who is now working for Aprojects, to re-route the shipment from the Summerville warehouse to a warehouse in Orangeburg. Adding insult to injury, Lesech arranged the transfer of a DT America-owned high-capacity forklift from DT America's Summerville warehouse (where ████████ originally requested the materials to be shipped) to Orangeburg to allow Dulle – who had just recently started working for Aprojects – to unload and store the goods on behalf of Aprojects. In short, Dulle and Lesech conspired with one another to use DT America equipment and DT America employees to perform services for a DT America customer all for the benefit of Aprojects.

55.    When a DT America operations employee, who was unaware of Lesech and Dulle's actions and motivations, notified Lesech of ████████ abrupt cancellation, Lesech directed the employee to not communicate with ████████ representative because "Sean [Dulle] is handling this in a different way with her. DT [America] doesn't own [Orangeburg]." In no uncertain terms, Lesech's message confirmed that, even while he was still a DT America employee, he knew about and, through Dulle, was intentionally directing the diversion of DT America business away from the company for the benefit of Aprojects by undercutting DT America's bids using DT America's confidential and trade secret bidding, shipping, and operations information.

56.    DT America has since discovered that Lesech's communication that "DT [America] doesn't own [Orangeburg]" holds independent significance separate and apart from the diversion of ████████████ business to Aprojects. Specifically, on October 14, 2024, SouthQuest Transportation, LLC ("SouthQuest"), which is a wholly owned subsidiary of DT

17

America, entered into an agreement with Spreader Bar Company, LLC ("SpreaderBar") to lease 25,000 square feet of warehouse space located at 1301 Whitman Street, Orangeburg, South Carolina (the "Orangeburg Lease"). Dulle, pursuant to his then-authority as a DT America Branch Manager to bind DT America's subsidiaries, executed the Orangeburg lease on behalf of SouthQuest and in so doing agreed to SpreaderBar's leasing rates that were well above market value.

57.     As it turns out, Dulle agreed to the inflated rates offered by SpreaderBar because, upon information and belief, SpreaderBar is a Wyoming shell company established and operated on behalf of Dulle himself. Logs that track the files that Lesech deleted from his DT America-issued computer show that Lesech had Spreaderbar corporate records in his possession in later 2024, and he may also have a personal interest in the company.

58.     Plaintiff's initial investigation has uncovered that on July 26, 2024, less than three months before he executed the Orangeburg Lease on behalf of SouthQuest, Dulle, in his individual capacity, entered into a commercial contract with Jennings Land & Investment, LLC to purchase real property at 1301 Whitman Street, Orangeburg, South Carolina – the same address reflected on the Orangeburg Lease. A review of property records confirmed the subsequent transfer of title from Jennings Land & Investment LLC *to SpreaderBar* for the real property purchased by Dulle at 1301 Whitman Street, Orangeburg, South Carolina.

59.     In short, Dulle purchased the Orangeburg warehouse, attempted to keep that purchase secret by recording the deed in the name of his shell company SpreaderBar, obligated his then-employer DT America's subsidiary, SouthQuest, to pay SpreaderBar inflated above-market rates for the use of a portion of the Orangeburg warehouse, and then, once he left DT America and in direct coordination with Lesech, utilized the remainder of the Orangeburg warehouse to act as

18

a holding facility for shipments he and the other Former Employees diverted away from DT America for the benefit of themselves and Aprojects. Upon information and belief, Defendants have used similar tactics to divert significant amounts of DT America's business to Aprojects from customers including ████████████████████ and others.

60.     DT America has also learned that Barron was communicating with DT America's Texas customers, vendors, and core carriers from her Aprojects email address while she was still employed by DT America. These former DT America contacts were critical to DT America's Houston operation and Barron, along with the other Former Employees, have now successfully diverted that business for the benefit of Aprojects resulting in significant financial losses for DT America. The efforts of the Former Employees to divert DT America's business in Houston and surrounding locations have provided Aprojects, and Project Services, the ability to establish a previously non-existent competitive foothold in the Texas market that would have taken years and substantial financial investment to develop on its own – if ever.

61.     Similarly, DT America has uncovered evidence that Lesech has contacted, and continues to contact, DT America's parent company DT Project's customers that, upon information and belief, would have utilized DT America for their North American shipping needs but for Lesech's involvement in securing those contracts for Aprojects.

62.     Unfortunately, the full scope of the diverted business cannot be ascertained without court intervention and access to discovery, because much of the evidence is currently in the exclusive possession of Defendants or their agents. Nevertheless, DT America's financial review and current projections indicate that as much as ██% of DT America's gross margin will be impacted by losing business that has been, or in all likelihood will be, illegally diverted for the benefit of Defendants and approximately $██████ in total revenue will be lost in the 2025

19

fiscal year as a result of the customer diversion if Defendants' actions are not restrained.

b. **Defendants Improperly Solicited DT America's Existing and Prospective Employees for the benefit of Aprojects.**

63.     Unfortunately for DT America, the Defendants not only targeted the company's customers but engaged in a coordinated raid of its workforce. Initial investigation has revealed that during and following the Former Employees' employment with the company, Defendants solicited both prospective and then-current DT America employees to join in their departures. In fact, as early as December 2024, before any of the Former Employees left DT America, Defendants were conspiring to deprive DT America of qualified employees.

64.     For example, on December 30, 2024, Lesech, Dulle, and other DT America employees were invited to interview prospective DT America employee Walter Weller. Following the interview on January 6, 2025, Mr. Weller followed up with a detailed summary of the goals and strategies that had been discussed with him including expectations that he would achieve the onboarding of 250 carriers in the first year, would establish relationships with current clients, and would purchase client and carrier lists within target markets.

65.     As it turns out, these goals were, upon information and belief, the targets the Former Employees expected Mr. Weller to reach *at Aprojects* and the interview itself was merely laying the groundwork for the Former Employees' operations when they ultimately defected to Aprojects. Indeed, Mr. Weller never joined DT America. Instead, he began his employment with Aprojects barely a month later on February 17, 2025, when he attended his onboarding with Dulle who had joined Aprojects only two weeks earlier.

66.     In addition to diverting qualified prospective employees away from DT America for the benefit of a competitor, the Former Employees also targeted DT America's existing workforce. Through logs that track the files that Lesech deleted from his DT America-issued

computer, Plaintiff has learned that in his final days at DT America, Lesech had "offer letters" for a number of DT America employees saved on this computer desktop, presumably to transition those employees to Aprojects or one of its subsidiaries like, upon information and belief, Project Services.

67.    There are several other examples of the Former Employees soliciting DT America personnel for the benefit of a competitor.  In one example, during their employment with DT America, the Former Employees approached a fellow DT America employee offering various incentives if he joined their new operation but he declined. Other current DT America employees have informed management that they were, and continue to be, approached by one or more of the Former Employees and offered positions with Aprojects. Thankfully, each of these current employees rejected Defendants' advances, but not all did.

68.    Following Lesech's final day with DT America on March 13, 2025, ten additional employees have left the company and, upon information and belief, are now working with the Former Employees on behalf of Aprojects. DT America's preliminary investigation has uncovered email correspondence from Lesech's Aprojects email address wherein, on April 15, 2025, Lesech requested that Aprojects' Finance Transformation Officer  set up Aprojects expense accounts for DT America's once prospective employee Mr. Weller as well as various individuals who had worked with Lesech at DT America through March 2025 including Charles Luther, Matthew Kogon, Zachary Klinczar, Katherine Hardin, and Anchalee Natelson. Lesech forwarded this email thread to Barron on May 2, 2025, only two days after Barron separated from DT America.

69.    Between April 24 and April 30, 2025, and shortly after the Defendants' transitional company Project Services was approved to do business in Texas,[2] all four full-time employees of

---

[2] Project Services registered to do business in Texas on March 14, 2025, just one day after Lesech's departure from DT America.

the Houston office, including its logistics coordinator, billing coordinator, intermodal logistics coordinator, and branch manager (Barron) departed DT America and went to work with Lesech for the benefit of Aprojects. The Houston exodus was particularly troubling because, unaware of the coordinated efforts amongst the Former Employees, DT America took proactive steps to prevent Barron and other Houston personnel from leaving. For example, following Lesech's departure, DT America's CEO traveled to Houston and offered Barron a retention package that included significant financial incentives if she remained with the company. When Barron rejected the offer she indicated that she was departing the company. She then conveyed that DT America's attempts to retain the other Houston based DT America employees would not only be fruitless, but also threatened that they would result in Barron taking retaliatory steps against the company.

70.    The fallout from the Former Employees' solicitation of DT America's employees was felt immediately. The loss of Barron and her team, who held the TSA license and IAC certifications and otherwise managed the vendor and core carrier relationships that once allowed the Houston office to manage the airfreight operations of DT America, forced DT America to rework the Houston office and convert it to a maritime shipping hub. This conversion resulted in significant capital expenditure and loss of exisitng business, that would not have been necessary or occurred but for the illegal solicitation of Barron's Houston team, and hindered DT America's operational capacity along with its ability to secure new business.

### c.  The Former Employees had access to DT America's Trade Secrets and are misappropriating them for their benefit and the benefit of Aprojects.

71.    DT America fosters its competitive edge in the marketplace by knowing how best to structure its bids for new projects for both prospective and existing customers.  Successful bidding relies on DT America's ability to accurately predict the price a customer will pay, the costs DT America will incur to complete the project, and the particular needs and demands that the

customer will have on that prospective project.

72.    DT America maintains a robust repository of information, developed at great expense to DT America and its parent companies over many years, about past bids, both successful and unsuccessful, and past projects, which it then leverages to develop bids for new work.  This includes information that derives value from not being publicly available, such as customer preferences, past pricing, customer approved or preferred vendors and core carriers along with their reliability, safety records, timelines, and overall quality of service, licensure requirements, previously successful logistics and routing strategies, and details of the preferences of decision makers within client organizations.

73.    DT America also keeps other detailed confidential records that derive value from not being publicly available including, but not limited to, past, current, and prospective customer and client lists, marketing strategies, warehouse operation information such as capacity limits and inventory metrics, and company financial records such as profit and loss statements and payroll information. The Former Employees each had access to DT America's confidential trade secret information during their employment by virtue of their managerial and/or executive roles and were all well aware of its sensitive nature, the value it would hold for DT America's competitors, and the measures that DT America took to protect it.

74.    For example, Lesech developed and implemented the employee agreements that were signed by Dulle, Barron, and the other DT America employees who followed the Former Employees to Aprojects. Each of those agreements defined the types of information that DT America and its employees agreed would be considered trade secrets or otherwise confidential:

> **"Trade Secret"** shall have the definition ascribed to it under applicable law, which generally defines it as information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value,

actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**"Confidential Information"** shall mean any information that: (a) relates to the business of the Company; (b) possesses an element of value to the Company; (c) is not generally known to the Company's competitors; and (d) would damage the Company if disclosed. In addition, Confidential Information shall include information provided to the Company which the Company is obligated to treat as confidential. Much of the Company's Confidential Information may qualify as a Trade Secret, however, to the extent it does not, it will be considered Confidential information. Confidential Information includes but is not limited to, the following types of information regarding the Company's: (aa) customer and client lists; (bb) operations, billing policies or procedures, financial and accounting information, or contracts; (cc) products and services or any component of such (including, but not limited to, information regarding the results of the Company's prior or current products, services, and methodologies, product research, development and design); (dd) costs and methods of operation, processes, methodologies, techniques, pricing, purchasing policies, marketing practices or growth plans (including, but again not limited to, all pending projects and proposals); (ee) information about any internal or external audits or investigations; (ff) sales strategies, teaching methods, business costs, business expansion plans and methods of operations; (gg) proposed or planned products and services; (hh) personnel matters, employee relations information, compensation data, private personal employee information, pension information and the like; and (ii) all legal and compliance matters and information.

75.     As described in prior sections of this Complaint, the agreements implemented by Lesech and agreed to by Barron and Dulle at various stages of their employment also restrict the disclosure of DT America's trade secrets and other confidential information. For example, the BRCA provides:

**Non-Disclosure of Trade Secrets or Confidential Information.** During employment, and for a period of one (1) year thereafter, Employee shall not divulge, use, furnish, disclose or make accessible to anyone other than the Company, any Confidential

Information or Trade Secrets belonging to the Company. This restriction applies for as long as the information remains Confidential Information or a Trade Secret….

76.     Furthermore, in addition to requiring employees to enter into contracts to protect its confidential information and trade secrets, Lesech guided DT America in employing various technological measures that all DT America employees were aware of to protect and maintain the confidentiality of its sensitive information including, but not limited to, restricting access to DT America computers via password controls, restricting access to and monitoring DT America's physical buildings via a badge-based security system and camera network, imposing multi-factor authentication protections on DT America's shared information systems, and limiting the dissemination of highly sensitive company material only to management and executive level employees or those operating on a need-to-know basis for a particular project.

77.     Despite these protective measures, all of which the Former Employees had knowledge of and many of which they themselves put in place, and the duties imposed on them by law, initial investigation has revealed that Lesech, Barron and Dulle, both before they left DT America and after, took affirmative actions to misappropriate DT America's trade secret information for their own benefit and for the benefit of Aprojects. Indeed, upon information and belief, most, if not all, of the prior, current, and anticipated lost DT America business described herein is attributable to the Defendants' use of DT America's confidential trade secret information to under-cut DT America's bids, divert DT America's long standing vendor relationships, and predict DT America's future strategic plans, all for the benefit of Aprojects. Unfortunately, DT America has yet to uncover the full scope of Defendants' misappropriation because, as alleged in more detail in Section IV below, the Former Employes, and others acting at their direction, took affirmative steps to conceal Defendants' illegal activities by, among other things, destroying the

evidence.

78.     Nevertheless, DT America's internal investigation and corresponding digital forensic review has uncovered some of the Former Employee's malfeasance. For example, Plaintiff has since learned that on March 6, 2025, DT America's then-Brokerage Manager Matthew Kogon, apparently acting at the direction of one or more of the Former Employees, sent an unusual request to various DT America employees asking them to fill in a spreadsheet to identify the names, contact information, primary operating areas, and equipment of all the core carriers they utilized in their roles. Mr. Kogon did not provide any explanation as to why he was making this request nor how the information was going to be used to benefit DT America. As it turns out, Mr. Kogan resigned from DT America three weeks later to follow the Former Employees to Aprojects and a vast majority of the core carriers that had been identified on the spreadsheet suddenly, and largely without explanation,[3] stopped accepting DT America's business and ceased returning DT America's emails and telephone calls. Upon information and belief, some of these core carriers now work alongside Aprojects.

79.     The central repository of more than 50 of DT America's tried-and-true core carriers that was likely compiled at the direction of one or more of the Former Employees constitutes precisely the type of confidential trade secret information that provided value to DT America by not being known by its competitors. It is also exactly the kind of corporate knowledge that DT America sought to protect by having its employees enter into restrictive covenants upon employment. However, despite DT America's best efforts, it appears to be in the possession of, and being utilized by, the Defendants to the detriment of DT America.

---

[3] While most of the core carriers fell totally silent, some did inform DT America employees that the carriers were no longer working with DT America due to the departure of, and representations made by, one or more of the Former Employees.

80.     DT America has also recently learned that Defendants are planning to submit bids on upcoming projects that Aprojects would not have had the capability or relationships necessary to be considered for without DT America's Former Employees and the knowledge, confidential and trade secret information, and connections they obtained while working for DT America and have since misappropriated for the benefit of Aprojects.

81.     For example, DT America is aware of a significant project for which ██████ intends to distribute Requests for Quotations to prospective bidders on or around ██████ Upon information and belief, Aprojects will receive this RFQ despite ██████ representatives previously expressing their dissatisfaction with Aprojects and the services they could provide before the Former Employees joined their ranks.  As has been done in other instances since the Former Employees' departure, DT America is informed and believes that Defendants will utilize DT America's confidential and trade secret information to undercut DT America's bid to ██████. If Defendants are again successful in leveraging their continued misappropriation of DT America's confidential information to divert the upcoming ██████ quote, DT America will be deprived of a significant percentage of the revenue it was projected to realize in the upcoming fiscal year.

## IV.     The Former Employees Took Affirmative Steps to Conceal Their Illegal Activities.

82.     Despite having conducted substantial portions of their wrongdoing while still employed by DT America, the Former Employees were able to prevent other DT America management from learning of their deceit, in part because of their senior roles with the company and in part because they took affirmative steps to cover their tracks.

83.     On or about March 26, 2025, a DT America employee noticed an unauthorized individual entering DT America's Charleston Warehouse. When the employee investigated, she identified that it was a representative of Charleston Technology Solutions, LLC ("CTS"), a third-

party technology company that DT America had previously utilized for IT services.

84.     The employee questioned the CTS representative as to why they were entering the warehouse through a side door, and the CTS representative responded that CTS was instructed by Matthew Krueger,[4] a then-DT America employee who, upon information and belief, now works with the Former Employees for the benefit of Aprojects, to return two computers that had recently had their hard drives wiped. DT America has so far been unable to confirm which DT America personnel used these two computers, but an employee has since informed Plaintiff that she remembered that the computers had 'gone missing' around the time of Dulle's and Lesech's departure.[5]

85.     Similarly, an initial forensic investigation reveals that the desktop that Lesech used for business at the Atlanta office was factory reset[6] at 6:29 a.m. local time on Sunday March 16, 2025, just three days after Lesech left DT America. As alleged in previous sections of this Complaint, forensic analysis shows that Lesech accessed a variety of sensitive information in the days leading up to the reset of his computer, such as DT America's financial planning spreadsheet detailing its 2025 finances and projections for future fiscal years. Furthermore, Lesech is one of few U.S. based DT America employees whose credentials would have allowed them to access DT America's Atlanta facility on a weekend. DT America has confirmed that on separate occasions, several days or weeks after he departed the company, Lesech used some version of his former security credentials to enter the Atlanta office on a weekday before any employees arrived. It is

---

[4] Notably, digital forensic investigation has shown that Mr. Kreuger's DT America computer is currently inaccessible due to BitLocker encryption.
[5] DT America has been unable to obtain further information or records from CTS, in part, because CTS maintains that they consider Dulle, not DT America, to be their client.
[6] Windows provides a built-in "Reset this PC" feature that reinstalls the operating system. Users can choose between two options: "Keep my files", which preserves user documents but removes apps and settings, and "Remove everything", which performs a deletion of user data, apps, and settings. Regardless of the option selected, both reset methods erase critical forensic artifacts such as USB connection history, user activity logs, and other system metadata that may be relevant to a forensic investigation.

currently unknown why Lesech trespassed on DT America's property or what actions he took while there.

86.    At least five (5) DT America computers, consisting of both laptops and desktops, were factory reset within a two-month period from February-March 2025, the same time that the Former Employees departed for Aprojects and took other DT America employees with them. Neither DT America, its parent companies, nor any of the current DT America employees are aware of a legitimate business purpose that would have required the computers to be reset or any data stored on them to be deleted. DT America's subsequent digital forensic investigation of the reset computers has been able to recover some information, largely in the form of logs that identify the names of deleted files, but the full scope and impact of the Former Employees' deletion efforts cannot be fully understood except through discovery or otherwise with the assistance of the Court.

87.    Several other pieces of company technology used by DT America employees who left to work with the Former Employees at Aprojects are currently in an encrypted or "BitLockered" state, rendering the data saved on the devices inaccessible without the required passwords. At present, DT America's forensic vendor cannot access the computers and will be unable to do so unless or until the Former Employees provide the computer passwords or BitLocker recovery keys that only they know.

88.    Before being wiped and/or BitLockered, the executive and management level computers used by the Former Employees had access to most, if not all, of DT America's sensitive corporate information including the entire warehouse management system, bid and brokerage information, personnel files, financial records, and critical customer data. The wipe of activity logs and transmission activity from some computers, and use of BitLocker encryption on others, renders further digital forensic investigations impracticable, thereby preventing DT America from

determining the full scope of the Defendants' misappropriation of DT America's confidential and trade secret information absent the use of judicial discovery processes. Upon information and belief, Defendants conspired to place DT America in precisely this situation and took affirmative actions to facilitate DT America's downfall while attempting to minimize the corresponding repercussions.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836, et. seq.
### (Against All Defendants)

89.     Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

90.     As described above, Plaintiff is the owner of valuable trade secrets within the meaning of the Defend Trade Secrets Act that it has developed over years and at considerable expense through its efforts and investments in relationships with customers, vendors, core carriers, suppliers, employees, and others.

91.     Each of these trade secrets was confidential and commercially valuable at the time of the misappropriation because they gave Plaintiff a competitive advantage in the relevant market by virtue of not being public. If a competing company obtained this information, that company would be at a competitive advantage over Plaintiff because it could target Plaintiff's customers and undercut Plaintiff's business using information that would not otherwise be available to the public.

92.     At all relevant times, Plaintiff has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its trade secrets, including, without limitation, requiring employees to contractually agree not to disclose confidential information, employing technological safeguards, and promulgating necessary corporate policies.

93.     As explained herein, each of the Defendants were and are aware of the sensitive and confidential nature of Plaintiff's trade secret information. Defendants' awareness is evidenced by, at the minimum, their express acknowledgment of the information's classification as trade secrets in the various contracts described throughout this Complaint, through their knowledge and understanding of Plaintiff's corporate policies and procedures related to the protection of its confidential trade secret information gained through their respective roles while employed by Plaintiff, and/or by the information being considered and treated as confidential and protected by the Defendants' and Plaintiff's industry at large.

94.     As previously alleged, Plaintiff is aware that misappropriation of its trade secrets by the Defendants has already happened, including but not limited to Defendants' repeated use of Plaintiff's protected and proprietary information to undercut Plaintiff's bids to its current and prospective customers in furtherance of diverting business for Defendants' benefit that would have otherwise been awarded to Plaintiff.

95.     Moreover, Plaintiff is threatened by further and future misappropriation by the Defendants whom Plaintiff is informed and believes will continue to disclose and misuse Plaintiff's trade secrets because of the close competitive position of Aprojects and/or Project Services.

96.     As a direct and proximate result of Defendants' misappropriation, Plaintiff has suffered irreparable harm, injuries, and damages, and will continue to suffer such irreparable harm, injury, and damages, including but not limited to, loss of business, loss of relevant market share, injury to business reputation and goodwill, loss of profits, and attorneys' fees and costs. Defendants have gained an unfair competitive advantage and other unjust enrichment through the acquisition and misuse of Plaintiff's trade secrets.

97.     Plaintiff will suffer irreparable harm unless Defendants are enjoined from the conduct alleged herein as Plaintiff has no adequate remedy at law for the injuries it will suffer if Defendants are permitted to continue using Plaintiff's trade secrets.

98.     Defendants' misappropriation of Plaintiff's trade secrets was done willfully and maliciously. Accordingly, Plaintiff is entitled to an award of exemplary damages under 18 U.S.C. section 1836(b)(3)(C).

99.     Plaintiff also seeks an award of its reasonable attorneys' fees pursuant to 18 U.S.C. section 1836(b)(3)(D), because Defendants willfully and maliciously misappropriated the trade secrets at issue.

## COUNT II
## CIVIL CONSPIRACY
## (Against All Defendants)

100.     Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

101.     As detailed herein, the Defendants agreed amongst themselves to take the illegal course of conduct against Plaintiff described in this Complaint and took the affirmative actions necessary to do so.

102.     Defendants conspired with one another to, among other things, execute a coordinated raid of Plaintiff's employees, misappropriate Plaintiff's trade secrets to solicit Plaintiff's customers and divert some or all of the customer's business from Plaintiff for the benefit of Defendants, breach the Former Employee's fiduciary duties and duties of loyalty to Plaintiff, and breach the contractual duties owed by some or all of the Former Employees. This conduct was done as part of a concerted effort and premeditated plan by Defendants to raid Plaintiff of its trade secrets, key employees, customers, vendors, core carriers, and good will and ultimately remove

Plaintiff's and its parent companies' ability to compete in North America.

103.    As a direct and proximate result of Defendants' actions, Plaintiff has been injured and suffered damages in an amount to be proven at trial.

104.    Plaintiff has also suffered, and will continue to suffer, irreparable harm, and will continue to suffer such harm absent injunctive relief.

105.    Defendants' conduct was oppressive, malicious, and willful and has subjected, and will continue to subject, Plaintiff to cruel and unjust hardship in conscious disregard for Plaintiff's rights, so as to justify an award of punitive damages.

**COUNT III**
**TORTIOUS INTERFERENCE**
**WITH EXISTING CONTRACT**
**(Against All Defendants)**

106.    Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

107.    Prior to Defendants' unlawful actions, Plaintiff had existing contractual and business relationships with ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ and others.

108.    Plaintiff also had existing contracts with the Former Employees.

109.    Defendants knew of Plaintiff's contracts with the foregoing customers, vendors, core carriers, and businesses, but nonetheless acted in concert to interfere with those contracts for the improper purpose of diverting that business for the benefit of Defendants.

110.    Defendants also knew of the Former Employees' obligations to Plaintiff under their

respective contracts but nonetheless acted in concert to interfere with those contracts for the improper purpose of obtaining Plaintiff's trade secrets and confidential information, harming Plaintiff's goodwill, and attempting to cripple Plaintiff's business.

111.    By engaging in such conduct both after the Former Employees shifted their loyalties from Plaintiff to Aprojects and before and after the Former Employees' resignations, Defendants intentionally, improperly, and maliciously interfered with the existing contractual relationships between Plaintiff and its customers, vendors, core carriers, and other businesses and between Plaintiff and the Former Employees.

112.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable harm. Plaintiff is threatened with losing the value of its trade secrets and confidential information and certain employee and customer, vendor, core carrier, and other business relationships and goodwill. Plaintiff has also suffered monetary injury as a result of Defendants' conduct.

113.    Defendants' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of punitive damages.

**COUNT IV**
**TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

114.    Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

115.    Prior to Defendants' unlawful actions, Plaintiff had existing relationships with

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ and others. Plaintiff enjoyed substantial profit from its economic and contractual relationships with said customers, consultants, vendors, core carriers and the like and invested significant funds in soliciting, developing, and maintaining these economic and contractual relationships.

116.    Given the relationship of trust and confidence developed between Plaintiff's personnel and its customers, vendors, core carriers, and others, and Plaintiff's investment of time and money to further that effort, Plaintiff reasonably expected that its contractual and economic relationships with its customers, vendors, core carriers, and others would continue through additional contractual and business dealings in the future.

117.    Defendants, acting in concert, wrongfully and without justification, interfered with the relationship between Plaintiff and its customers, consultants, vendors, and core carriers by inducing such customers, consultants, vendors, and core carriers to work with the Defendants to the detriment of Plaintiff.

118.    By the above-described acts, Defendants, acting in concert, tortiously interfered with the expected economic advantage deriving from the relationships between Plaintiff and its customers, consultants, vendors, and core carriers.

119.    As a direct and proximate result of Defendant's actions, Plaintiff has been injured and suffered damages in an amount to be proven at trial.

120.    Plaintiff has also suffered, and will continue to suffer, irreparable harm, and will continue to suffer such harm absent injunctive relief.

121.    Defendants' conduct was oppressive, malicious, and willful and has subjected and will continue to subject Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's

rights, so as to justify an award of punitive damages.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(Against Former Employees)**

122.     Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

123.     The Former Employees, by virtue of their positions, job functions, and role in Plaintiff's business, owed Plaintiff certain fiduciary duties including but not limited to a duty of loyalty and utmost good faith, a duty of candor, a duty to refrain from self-dealing, a duty to act with integrity of the strictest kind, a duty of fair and honest dealing, and a duty of full disclosure. Lesech, as an officer of Plaintiff, also owed Plaintiff a duty not to usurp corporate opportunities for personal gain, duty of the utmost good faith in his relations with the corporation, and a duty to fully disclose any personal interest Lesech had in the subject matter of the contracts he negotiated with the corporation.

124.     The Former Employees violated their fiduciary duties by, at a minimum, failing to apprise Plaintiff of their scheme, by working in their own best interests to the detriment of the company during and after their employment, deceiving Plaintiff's other directors, managers, and board members, soliciting Plaintiff's employees, diverting current and prospective business away from Plaintiff, and engaging in the various acts set forth herein. Plaintiff is informed and believed that the Former Employees engaged in further acts in breach of their fiduciary duties but endeavored to, and did, conceal the full scope of those acts through manipulation of Plaintiff's technology platforms.

125.     As a direct and proximate result of the Former Employees' violations, Plaintiff has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**COUNT VI**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against All Defendants)**

126.    Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above as though fully set forth herein.

127.    As alleged above, the Former Employees committed a number of torts against Plaintiff, including breach of fiduciary duty.

128.    Plaintiff is informed and believes that Aprojects, Project Services, and each of the Former Employees were aware of the fiduciary duties that all of the Former Employees owed to Plaintiff.

129.    Aprojects and Project Services, through its various communications with the Former Employees, and upon information and belief, knew that the Former Employees were breaching their fiduciary duties to Plaintiff for the benefit of Aprojects and/or Project Services.

130.    Upon information and belief, Aprojects and Project Services actively participated in, encouraged, or substantially assisted in, the Former Employees' breaches of fiduciary duty by directing those actions.

131.    Similarly, the Former Employees were each aware of, assisted in, and encouraged the other Former Employees to breach their fiduciary duties owed to Plaintiff.

132.    As a direct and proximate result of Aprojects', Project Services', and the Former Employees' aiding and abetting, Plaintiff has suffered monetary and reputational harm and, absent injunctive relief, may continue to suffer general and specific damages.

**COUNT VII**
**BREACH OF CONTRACT**
**(Against Barron)**

133.    Plaintiff hereby realleges and incorporates the allegations in Paragraphs 1-88 above

as though fully set forth herein.

134.    For good and adequate consideration, Barron and Plaintiff entered into the valid, enforceable BRCA on December 14, 2023.

135.    Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations under the BRCA.

136.    The terms of the BRCA prohibit Barron from (1) misusing or disclosing Plaintiff's confidential information and trade secrets, (2) soliciting Plaintiff's customers, or (3) recruiting Plaintiff's employees during Barron's employment and for a period of one year thereafter.

137.    The restrictive covenants contained in the BRCA were reasonable, consistent with public policy, and necessary to protect Plaintiff's legitimate business interests, including its interests in protecting its goodwill and confidential business information and trade secrets.

138.    Barron breached her contractual obligations to Plaintiff under the BRCA by, among other conduct, (i) providing services to and on behalf of Project Services and Aprojects during and after her employment with Plaintiff during the non-competition period; (ii) disclosing Plaintiff's confidential information and trade secrets to Project Services, Aprojects, and others; (iii) failing to return property and materials containing Plaintiff's confidential information and trade secrets upon termination of her employment; (iv) soliciting other Plaintiff employees to leave their employment with Plaintiff to work for Aprojects and/or Project Services; and/or (v) soliciting Plaintiff's customers or potential customers to use Aprojects' and/or Project Services' services instead of Plaintiff's services.

139.    Plaintiff has suffered, and will continue to suffer, irreparable harm as a result of these breaches and threatened continued breaches. Plaintiff is threatened with losing the value of its trade secrets and confidential information and certain employee and customer relationships and

goodwill. Plaintiff has also suffered monetary injury as a proximate result of Barron's breaches.

## **JURY DEMAND**

140.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury of any issues so triable by right.

## **PRAYER**

Wherefore, Plaintiff DT America Corporation respectfully requests that the Court enter judgment in its favor and grant the following relief:

(a)  Preliminary and permanent injunctive relief;

(b)  Actual and compensatory damages;

(c)  Disgorgement of unjust enrichment;

(d)  Exemplary damages;

(e)  Attorney's fees and costs;

(f)  Pre-and post-judgment interest;

(g)  Such other relief as the Court deems just and proper.

*[signatures on following page]*

Dated: August 8, 2025                    Respectfully submitted,

                                         **MICHELMAN & ROBINSON, LLP**

                                         */s/ A. Madison Dini*
                                             A. Madison Dini
                                             Attorney-In-Charge
                                             Texas Bar No. 24094667
                                             SDTX Federal No. 3423516
                                             mdini@mrllp.com
                                             Corbett L. Enright
                                             Texas Bar No: 24103285
                                             SDTX Federal No. 3711511
                                             cenright@mrllp.com
                                         717 Texas Avenue, Suite 3100
                                         Houston, TX 77002
                                         Telephone: (713) 422-2121
                                         Facsimile: (713) 383-6151

                                         Jon-Jamison Hill
                                         Michelman & Robinson, LLP
                                         10880 Wilshire Boulevard, 19th Floor
                                         Los Angeles, CA 90024
                                         Telephone: (310) 299-5500
                                         Facsimile: (310) 299-5600
                                         jhill@mrllp.com
                                         *Pro Hac Vice* to be filed

                                         **ATTORNEYS FOR PLAINTIFF
                                         DT AMERICA CORPORATION**